IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT C. ALLEN, as Administrator of the ESTATES OF T.G.A. and Z.D.A, <br><br> Plaintiff, <br><br> v. <br><br> FOXWAY TRANSPORTATION, INC., TEMPEL STEEL, and GATEWAY FREIGHT SYSTEMS, INC., <br><br> Defendants. | No. 4:21-CV-00156 <br><br> (Chief Judge Brann) |

MEMORANDUM OPINION

FEBRUARY 1, 2024

I.   BACKGROUND

A.   Procedural Background

Currently before the Court are motions from Plaintiff Robert Allen and Defendant Gateway Freight Systems, Inc. to exclude each other's expert witnesses, Kenneth Lacey and Lane VanIngen respectively.[1] These motions come on the heels of cross-motions for summary judgment, which the Court resolved in Gateway's favor except as to Allen's claim for negligent entrustment.[2] The Court observed that the parties' arguments as to that issue turned on competing expert opinions, which

---

[1]   Pl. Mot. to Exclude L. VanIngen, Doc. 160; Def. Mot. to Exclude K. Lacey, Doc. 163.
[2]   Dec. 7, 2023 Ord., Doc. 158.

precluded a grant of summary judgment.[3] The Court also noted that the parties had previewed forthcoming *Daubert* motions to exclude the testimony of each other's experts.[4] In the interest of judicial economy, the Court instructed the parties to file those motions by December 28, 2023. The parties did so, and each motion is briefed and ripe for disposition.[5]

### B. Negligent Entrustment

The Court assumes the parties' familiarity with the factual background of this suit, a more extensive discussion of which by the Court can be found in the Court's prior Opinions.[6] Accordingly, the Court will only summarize the issues relevant to the currently pending *Daubert* motions.

Gateway, on behalf of Tempel Steel, retained Foxway Transportation, Inc.[7] to transport a shipment of Tempel's product from Tempel's Canadian location to two locations in Pennsylvania. While transporting the shipment, Foxway's driver, Volodymyr Frolyak, was involved in an accident which resulted in the death of Allen's children, giving rise to this lawsuit. In support of his motion for summary

---

[3] Mem. Op. Re: Mots. Summ. J. ("MSJ Op."), Doc. 157 at 26. *See also id.* at 10 ("Where issues turn on opposing expert reports, 'a genuine issue of fact patently exists preventing summary judgment.'") (quoting *In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig.*, 2021 WL 8016522 (M.D. Pa. July 19, 2021)).

[4] *Id.* at 26-27. Gateway confirmed it intended to file such a motion in its opposition to Allen's motion. Doc. 170 at 2 n.1.

[5] Br. Supp. Mot. to Exclude L. VanIngen, Doc. 161; Opp. Mot. to Exclude L. VanIngen, Doc. 170; Reply Mot. to Exclude L. VanIngen, Doc. 171; Br. Supp. Mot. to Exclude K. Lacey, Doc. 164; Opp. Mot. to Exclude K. Lacey, Doc. 166; Reply Mot. to Exclude K. Lacey, Doc. 172.

[6] *E.g.*, MSJ Op. Section III.

[7] Both are co-defendants in this litigation.

judgment, Allen argued that Gateway "knew or should have known that Foxway was negligent in retaining its drivers, including Volodymyr Frolyak."[8] Gateway, in support of its own motion, argued that the record was devoid of any evidence supporting Allen's argument.[9]

Pennsylvania has adopted the standard for negligent entrustment set out in Section 308 of the Restatement of the Law (Second) of Torts:

> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.[10]

The Court found that, "by possessing the authority to assign the shipment, and ultimately assigning it to Foxway, Gateway had the requisite control over the 'activity' of shipping the goods."[11] Therefore, the relevant inquiry is whether Gateway knew or should have known that Foxway was likely to create an unreasonable risk of harm to others in transporting the shipment.

## II. FEDERAL RULE OF EVIDENCE 702

Federal Rule of Evidence 702 requires that expert testimony is (1) qualified, (2) reliable, and (3) assists the trier of fact.[12] "Before the proposed testimony gets

---

[8] MSJ Op. 25 (citing Doc. 144 at 38).
[9] *Id.* at 26 (citing Doc. 125 at 42).
[10] *Phillips v. Lock*, 86 A.3d 906, 913 (Pa. Super. 2014).
[11] MSJ Op. 26.
[12] *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020).

presented to the jury, the trial judge evaluates its admissibility based on these three requirements."[13] "Where the admissibility of expert testimony is specifically questioned, Rule 702 and *Daubert* require that the district court make explicit findings, whether by written opinion or orally on the record, as to the challenged preconditions to admissibility."[14]

### A.  Qualifications

"Qualification requires 'that the witness possess specialized expertise.'"[15] Rule 702's qualification requirement is to be liberally construed.[16] The United States Court of Appeals for the Third Circuit has instructed that courts should "eschew[] overly rigorous requirements of expertise and [be] satisfied with more generalized qualifications."[17] Accordingly, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."[18] A "broad range of knowledge, skills, and training" suffice to qualify an expert.[19]

---

[13] *U.S. v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010)

[14] *Sardis v. Overhead Door Corp.*, 10 F.4th 268 (4th Cir. 2021) (citing *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1190 (9th Cir. 2019); *Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 201 (5th Cir. 2016); *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)).

[15] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (quoting *Schneider ex rel. Estate of Schneider v. Fried,* 320 F.3d 396, 404 (3d Cir.2003)).

[16] *Id.* (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

[17] *Paoli*, 35 F.3d at 741 (citing *Hammond v. International Harvester Co.*, 691 F.2d 646, 652–53 (3d Cir. 1982); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87–88 (3d Cir. 1979)).

[18] *Id.* (quoting *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996)).

[19] *Pineda*, 520 F.3d at 244 (quoting *Paoli*, 35 F.3d at 741).

B.     **Reliability**

"Rule 702's reliability threshold requires expert testimony to be 'based on methods and procedures of science, not on subjective belief and unsupported speculation.'"[20] The opinion of a qualified expert "is admissible so long as the *process or technique* [as opposed to the conclusion] the expert used in formulating the opinion is reliable."[21] Thus, "[t]he reliability of an expert's conclusions and opinions hinges on the reliability of the expert's methodology."[22]

The United States Supreme Court has recognized that "the relevant reliability concerns may focus upon personal knowledge or experience."[23] In such circumstances, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[24]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions they generate."[25] Therefore, parties offering expert testimony do not "have to prove their case twice—they do not have to demonstrate to the judge

---

[20]  *UGI Sunbury*, 949 F.3d at 833-34 (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017); *In re TMI Litig.*, 193 F.3d 613, 703 (3d Cir. 1999)).
[21]  *In re TMI Litig*, 193 F.3d at 664 (citing *Paoli*, 35 F.3d at 742) (emphasis in original).
[22]  *Wood v. Showers*, 822 F. App'x 122, 124 (3d Cir. 2020) (citing Fed. R. Evid. 702(c)).
[23]  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999). *See also Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ("[T]here may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it . . . .")
[24]  Fed. R. Evid. 702, Advisory Comm. Notes, 2000 Amendments.
[25]  509 U.S. 579, 595 (1993).

by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable."[26]

Nevertheless, because "expert evidence can be both powerful and quite misleading,"[27] courts have recognized that "the importance of the gatekeeping function cannot be overstated."[28] A recent amendment to Rule 702 "clarif[ied] and emphasize[d] that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."[29] The amendment was motivated by the Advisory Committee's "observation that in 'a number of federal cases . . . judges did not apply the preponderance standard of admissibility to Rule 702's requirements of sufficiency of basis and reliable application of principles and methods, instead holding that such issues were ones of weight for the jury.'"[30] The Committee emphasized that rulings which have held "the critical questions of the sufficiency of an expert's basis for his testimony, and the application of the expert's

---

[26] *Paoli*, 35 F.3d at 744.
[27] *Sardis*, 10 F.4th at 283 (quoting *Daubert*, 509 U.S. at 592).
[28] *Id.* (quoting *United States v. Barton*, 909 F.3d 1323, 1331 (11th Cir. 2018)).
[29] Fed. R. Evid. 702, Advisory Comm. Notes, 2023 Amendments.
[30] *Sardis*, 10 F.4th at 283-84 (quoting Advisory Comm. on Evidence Rules, *Agenda for Committee Meeting* 17 (Apr. 30, 2021)).

methodology, are generally questions of weight and not admissibility" "are an incorrect application of Rules 702 and 104(a)."[31]

### C. Fit

The issue of whether an expert's testimony will assist the trier of fact "is typically understood in terms of whether there is a sufficient 'fit' between the expert's testimony and the facts that the jury is being asked to consider."[32] In assessing whether an expert's proposed testimony "fits," courts ask "'whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"[33] "The 'standard is not that high,' but 'is higher than bare relevance.'"[34]

The Third Circuit has instructed that, in weighing whether the proffered witness testimony will help the trier of fact, "the District Court must ensure that an expert does not testify as to the governing law of the case."[35] "[T]he line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's

---

[31] *Id.* at 284 (quoting Advisory Comm., *Agenda* at 105, 107). *See also Wood v. Showers*, F. App'x 122, 125 (3d Cir. 2020) (rejecting argument that flaws in the reliability of an expert's principles and methods are a question for the jury); *Kumho Tire*, 526 U.S. at 158-59 (Scalia, J. concurring) ("[T]rial-court discretion in choosing the manner of testing expert reliability . . . is not discretion to abandon the gatekeeping function . . . [and] it is not discretion to perform the function inadequately.")
[32] *Schiff*, 602 F.3d at 172-73 (citing *Daubert*, 509 U.S. at 591).
[33] *Id.* (quoting *Daubert*, 509 U.S. at 591; *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985)).
[34] *Id.* (quoting *Paoli*, 35 F.3d at 745).
[35] *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006).

compliance with customs and practices that implicate legal duties."[36] "It is settled law that an expert may testify about common behavior patterns in a profession or subculture"[37] so long as the expert does not testify as to "legal duties arising therefrom."[38]

### III. DISCUSSION

Allen's expert, Kenneth Lacey, opines that "Gateway made no effort to make certain Foxway, or any other motor carrier to which it entrusted its freight, in any way operated safely, or compliant with federal and/or state regulations."[39] He notes that "Gateway had no information as to Foxway's crashes, hours of service violations, driver fitness violations, [or] moving violations for the 3 year period after it initially qualified them" as "subsequent vetting," in Gateway's view, "wasn't customary," despite having retained Foxway to transport 120 shipments during that time.[40] Lacey also noted that the driver, Frolyak, "had 2 significant speeding violations in the 15 months prior to the crash" which Gateway was also unaware of.

Lacey faults Gateway for failing to utilize carrier monitoring services, such as Carrier 411, which Gateway had access to and which could have alerted Gateway to crashes, moving violations, and disqualified driver violations involving Foxway.[41]

---

[36] *Id.*
[37] *U.S. v Price*, 458 F.3d 202, 212 (3d Cir. 2006) (citing *United States v. Watson,* 260 F.3d 301, 307 (3d Cir.2001) (collecting cases)).
[38] *First Nat'l State Bank v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (*per curiam*).
[39] Lacey Report, Def. Ex. A, Doc. 164-1, at 12.
[40] *Id.* at 12-13.
[41] *Id.* at 13.

He suggests that Gateway should have instituted a "corrective action plan" with regard to Foxway, if not terminated Foxway's services altogether, due to Foxway's crash and violation history.[42] Lacey concludes that "Gateway's failure to conduct any safety and compliance data reviews, and shut[ting] off the measuring and alert capabilities of Carrier 411 . . . directly resulted in the October 20, 2019 crash and its resulting injuries."[43]

### A.    Qualifications

Gateway argues that "Lacey is not qualified to testify regarding liability, causation, or negligence generally or of a broker."[44] In support, Gateway notes that Lacey's *curriculum vitae*[45] is devoid of "relevant work or educational experience relating to [Allen's] use of Lacey and [his] Report in support of liability, causation, and direct negligence arguments against Gateway, *a broker*."[46] Allen insists that Lacey's experience "[a]s a safety and operational consultant . . . with both the motor carrier and brokerage industries" is sufficient to qualify him to testify as an expert.[47]

Lacey is currently employed by KJL Safety and Claims Services, LLC as a "safety and operational consultant" where he works with transportation companies to "establish and/or improve their safety programs and overall safety

---

42   *Id.*
43   *Id.*
44   Doc. 164 at 17.
45   Lacey CV, Def. Ex. B, Doc. 164-2.
46   Doc. 164 at 18 (emphasis in original).
47   Doc. 165 at 10.

performance."[48] Previously, Lacey was an executive "responsible for the operations and oversight" of both motor carriers and a freight brokerage and logistics company."[49] Throughout his career, he was responsible for developing various driver safety, training, and compliance initiatives.[50] Allen also directs the Court to testimony given by Lacey in other cases where he "delineated his work in the brokerage industry," including one case where he testified regarding the "[i]mproper selection of a motor carrier by the broker or logistics-shipper entity as well as agency."[51]

Contrary to Gateway's suggestion otherwise, Lacey *does* have experience working with brokers in the transportation industry. Even if he did not, the Third Circuit's instruction that courts "satisfied with more generalized qualifications" forecloses Gateway's argument that extensive experience in the transportation industry regarding driver safety, training, and compliance initiatives is insufficient unless he has worked with brokers specifically.[52] Put into the context of the facts of this case, an individual in such a role at Foxway, a motor carrier, would necessarily have experience regarding the practices and customs of Gateway, a broker, in the selection of motor carriers.

---

[48] Lacey Report 2.
[49] *Id.*
[50] *See generally* Lacey CV.
[51] Doc. 166 at 3-4.
[52] *Paoli*, 35 F.3d at 741 (citing *Hammond v. International Harvester Co.*, 691 F.2d 646, 652–53 (3d Cir. 1982); *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87–88 (3d Cir. 1979)).

### B. Reliability

Gateway argues that, even if Lacey is qualified, "his proffered opinions and testimony are unclear, conclusory, speculative, and unreliable and must be excluded."[53] As the relevant inquiry focuses "solely on principles and methodology,"[54] the Court begins with Lacey's method:

> The method is to review available data which at a minimum include crash reports, the company's existing driver safety program, and the driver's file. The method is then to review deposition testimony taken in the case as well as available driver and company related discovery. Then after such review, the method is to determine whether any safety rules or regulations have been followed or violated and determine whether any violations resulted in the crash in question. I followed this methodology in this case.[55]

Lacey's report begins with a description of his experience with "industry wide transportation safety programs and practices" which have "been developed and become generally accepted over time."[56] He notes that "[s]afety programs and practices change over time often as the result of the industry reaction to driver safety issues that result in crashes and injuries."[57] Lacey opines that Gateway's failure to monitor safety related information regarding the motor carriers it selects, including Foxway, was contrary to the "standard industry practice."[58] He notes that the failure

---

[53] Doc. 164 at 19.
[54] *Daubert*, 509 U.S. at 595.
[55] *Id.*
[56] Lacey Report at 3.
[57] *Id.*
[58] *Id.* at 12.

11

to do so meant that Gateway was unaware of various violations by Foxway that would have put it on notice of Foxway's poor safety record.[59]

Lacey does not, however, "determine whether any safety rules or regulations have been followed or violated [which] resulted in the crash in question."[60] Thus, as Gateway argues, it seems that Lacey has failed to follow his own methodology. In Lacey's defense, Allen argues that Lacey need not identify any statutory or regulatory violation to testify regarding the "industry standards in the brokerage industry [which] require a broker to review and check for safety violations."[61] As a general matter, Allen is correct. While evidence of a statutory or regulatory violation may help prove that a party has breached the relevant standard of care, it is not necessary.[62] On the contrary, though experts may testify to industry practices and customs regarding compliance with statutory or regulatory requirements, they are not permitted to testify regarding their own interpretations of statutes or regulations.[63]

However, to the extent that identifying a violation of a safety rule or regulation is part of Lacey's methodology, the Court agrees with Gateway that his failure to do

---

[59] *Id.* at 11-12.
[60] Lacey Report at 3.
[61] Doc. 166 at 12.
[62] *Cf. Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 890 (3d Cir. 2020) (observing that a violation of a statute *might* help prove a breach of a standard of care).
[63] *Hood v. Sellers*, No. 3:17-CV-00275, 2018 WL 3429708 at *2 (M.D. Pa. July 16, 2018); *accord Hartle v. FirstEnergy Generation Corp.*, No. 08-1019, 2014 WL 5089725 at *5 (W.D. Pa. Oct. 9, 2014) (citing *Berckeley,* 455 F.3d at 218; *U.S. v. Leo,* 941 F.2d 181, 197 (3d Cir. 1991)).

so raises an issue. As an initial matter, as an expert cannot opine as statutory or regulatory violations, the Court is skeptical that a methodology that requires an expert to do just that could ever form the basis of an admissible opinion. The Court also agrees that the disconnect between Lacey's methodology—which includes identifying violations—and his conclusion—which does not mention any such violations—renders those conclusions unreliable.

Further, certain of Lacey's opinions appear to be based on nothing more than speculation. Lacey suggests that Foxway "likely had to reduce its insurance due to being denied loads from shippers actually checking Foxway's [safety] rating [and] refus[ing] to use them."[64] There is nothing in Lacey's report to support this logical leap. Nor is there any meaningful discussion of any industry practice or custom which would require brokers to independently vet the individual drivers of motor carriers.[65] Neither does Lacey's report contain any basis for his summary conclusion that Gateway retaining Foxway "directly resulted in the October 20, 2019 crash and its resulting injuries."[66]

Finally, and most critically, Lacey does not explain why, even if Gateway had been more closely monitoring Foxway, it would have been inappropriate for Gateway to continue to retain Foxway to deliver shipments. Lacey does not offer

---

[64] Lacey Report 12.
[65] The Court also notes that none of Frolyak's violations appear in the list of identified Foxway violations, which further calls into question how it is Gateway would have learned about them. *Id.* at 11.
[66] *Id.* at 13.

any context for any of the prior Foxway violations or accidents.[67] Lacey identifies two prior crashes but offers no detail regarding them such as whether Foxway was at fault.[68] He identifies eight traffic violations over a roughly three-year period but does not explain why those violations would have, in his experience, caused any broker to not retain Foxway. Lacey does not identify any standards used by brokers in the transportation industry for evaluating the safety record of a motor carrier.

By way of example, Lacey does not explain why Foxway's eight violations is so many as to give a broker pause. In the alternative, he does not explain why the kinds of violations at issue are of the type that would put a broker on notice that assigning shipments to Foxway would create an unacceptable risk of danger. The closest Lacey comes is his conclusory assertion that these violations resulted in Foxway's Canadian Commercial Vehicle Operator's Registration rating dropping from "satisfactory" to "conditional" a year prior to the accident.[69] But, just as there is no explanation for why these violations should have put Gateway on notice regarding Foxway's purported unsafe practices, Lacey does not offer any explanation or evidence in support of his conclusion that Foxway's lower CVOR rating was a result of the identified violations.[70]

---

[67] *Id.* at 11.
[68] A third crash postdates the events leading up to this lawsuit. *Id.*
[69] *Id.* at 12.
[70] The Court notes that, in the United States, a motor carrier can be given a "conditional" rating based on improper record keeping. *See generally Commodity Carriers, Inc. v. Federal Motor Carrier Safety Admin*, 434 F.3d 604 (D.C. Cir. 2006) (affirming conditional rating where carrier did not keep sufficient records regarding hours of service for its drivers). While the

Illustrative of the deficiencies of Lacey's report is that the same report and reasoning could have been used regardless of the number or type of past violations by Foxway. The report reads no differently if the number of violations is cut in half or doubled, or if they were all a certain type. The only discernable guideline appears to be that whatever Lacey's research of Foxway had turned up would have been sufficient for him to find that it had a propensity to act in an unsafe manner.

At best, Lacey's report can fairly be read in support of the proposition that, based on his experience, it is customary for brokers in the transportation industry to continually monitor the motor carriers they use. Any opinion beyond that falls below the standard for reliability established by *Daubert* and its progeny.

### C. Fit

Gateway further argues that Lacey's opinion should be excluded because it is unduly prejudicial and not tied to the facts of the case. The Court will limit its analysis to the only arguably admissible opinion Lacey offers; that it is consistent with industry standards for brokers to continually monitor the safety records of motor carriers. The Court finds that Lacey's opinion that it is common practice in

---

record keeping at issue in *Commodity Carriers* does relate to a safety issue—the ability to verify maximum hours of service of employees—it demonstrates that reduction in rating is not proof of unsafe practices. The issue in *Commodity Carriers* was that the FMCSA could not verify that the plaintiff was in compliance with hours of service requirements, not that it had in fact violated those requirements.
Here, Lacey does not offer any evidence for his conclusion that Foxway's CVOR rating was dropped due to safety concerns, let alone that such a rating should have put Gateway on notice that Foxway was likely to transport the shipment in an unsafe manner.

the transportation industry to continually monitor safety records using third-party vendors, safety scores, and other sources is plainly relevant, and would be helpful to a jury tasked with determining what Gateway should have known about Foxway's safety record.

Therefore, the Court will grant Gateway's motion to exclude Kenneth Lacey, except as to his opinion that industry standards imposed upon Gateway a continuing obligation to conduct ongoing "safety and compliance data reviews."[71]

### IV. SUMMARY JUDGMENT

In its Memorandum Opinion regarding the parties' motions for summary judgment, the Court indicated that it would revisit those motions as to the issue of negligent entrustment following resolution of any *Daubert* challenges. Having held that Allen's expert report is largely inadmissible, the Court now returns to the parties' summary judgment motions.[72]

In support of his motion for summary judgment as to his claim of negligent entrustment, Allen argues that "Gateway was obligated to do its due diligence in checking that the trailers and loads were being transported by reliable and safe sources while on the highways."[73] Even if the Court assumes this is true, now that the corresponding parts of Lacey's opinion have been excluded, there is no evidence

---

[71] Lacey Report 13.
[72] The Court accordingly incorporates the relevant discussion from its prior Opinion. MSJ Op. Sections II.A., IV.D.
[73] Doc. 114 at 38-39 (citing *Adames v. May Furniture, Inc.*, No. 1:17-CV-00652, 2019 WL 8937042 (M.D. Pa. Nov. 26, 2019)).

in the record which shows that, had Gateway conducted this due diligence, it would have known that Foxway was "likely . . . to create an unreasonable risk of harm to others."[74] The absence of such evidence compels the denial of Allen's motion for summary judgment as to negligent entrustment, and the grant of Gateway's own motion as to that claim.[75]

## V.  CONCLUSION

For the foregoing reasons, Defendant Gateway Freight Systems, Inc.'s Motion to Exclude Expert Kenneth Lacey is granted. Plaintiff Robert Allen's Motion to Exclude Lane VanIngen is denied as moot. Gateway's Motion for Summary Judgment as to Count X of Allen's Amended Complaint is granted and Allen's Motion as to that claim is denied.

The Court notes that Allen appears to have settled his claims against Foxway.[76] However, Allen has not filed a motion to dismiss those claims—the Court is only aware of the settlement because Gateway argued Allen released Gateway from liability.[77] Gateway has also filed a Third Party Complaint which appears to be moot now that Allen's claims against it have been dismissed.[78] Allen's claims against Tempel Steel also remain pending. However, it is a mystery to the Court

---

[74] *Phillips*, 86 A.3d at 913.
[75] As VanIngen was offered only as a rebuttal expert and the Court did not need to consider his opinions in evaluating the parties' negligent entrustment arguments, Allen's motion to exclude VanIngen will be denied as moot.
[76] Executed Settlement Agreements, Docs. 118-32, 118-33.
[77] Doc. 125 Section V.C.
[78] Third Party Compl., Doc. 78.

whether this is because Tempel and Allen intend to proceed to trial, or if the parties have also settled those claims without notifying the Court. Therefore, the Court will require the parties to file a joint status update by February 15, 2024 detailing any live disputes or other issues that remain. To the extent there are any live disputes, the parties should also indicate what steps need to be taken prior to scheduling a date for trial. Upon receipt of the parties' status update, the Court will schedule a telephonic status conference with counsel of record.

      An appropriate Order follows.

                                      BY THE COURT:

                                      *s/ Matthew W. Brann*
                                      Matthew W. Brann
                                      Chief United States District Judge